**FILED**
**CLERK**

4:06 pm, Nov 06, 2019

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ADNAN ALAM KHAN,

                Plaintiff,

      -against-

ADDY'S BBQ LLC and NAUMAN CHEEMA,

                Defendants.
-------------------------------------------------------------X

**OPINION AND ORDER**
19-cv-2235 (SJF)(AYS)

FEUERSTEIN, United States District Judge

        On April 16, 2019, plaintiff Adnan Alam Khan ("plaintiff" or "Khan") commenced this action against defendants Addy's BBQ LLC ("Addy's BBQ") and Nauman Cheema ("Cheema") (collectively, "defendants"), alleging, *inter alia*, trademark infringement, false designation of origin and unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and New York common law; trademark dilution in violation of the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c), and Section 360-*l* of the New York General Business Law; and cybersquatting in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d). Presently before the Court are: (i) plaintiff's motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order ("TRO") and preliminary injunction enjoining and restraining defendants from using the mark, "Addy's BBQ," and the domain name, http://addysbbq.com/; and (ii) defendants' cross motion to cancel plaintiff's registration of the service mark, "Addy's Barbeque," pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119. For the reasons set forth herein, plaintiff's motion is denied in its entirety; and defendants' cross motion is granted to the extent that defendants are granted leave to amend their answer to assert a counterclaim seeking to cancel

plaintiff's registration of his service mark pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119 on the basis that the registration was obtained fraudulently, and their cross motion is otherwise denied.

I.      BACKGROUND

A.  Factual Background

Plaintiff is a self-proclaimed "professional Chef," (Declaration of Adnan Alam Khan in Support of Motion for TRO ["Plf. Decl."], ¶ 2)[1], who also goes by the name "Addy" or "Chef Addy." (*Id.*, ¶ 3). In or around March 2015, plaintiff opened a restaurant named "Addy's Barbeque," located at 1199 Teaneck Road, Teaneck, New Jersey, 07666 (the "Teaneck restaurant"). (*Id.*, ¶ 2).

In or about November 2017, Cheema met with plaintiff in New Jersey and "expressed interest in opening up a restaurant on Long Island, New York." (Declaration of Nauman Cheema in Support of Cross Motion and in Opposition to Motion for a TRO ["Cheema Decl."], ¶ 3). According to Cheema, plaintiff "expressed great joy in this proposal . . . since he had just earlier that day put his restaurant in Teaneck, New Jersey up for sale." (*Id.*; *see also Id.*, ¶ 5 [asserting that when Cheema "initially met plaintiff . . . his [Teaneck] restaurant was failing"]). Cheema's brother, Umar Cheema ("Umar"), who is the head chef at the Long Island restaurant subsequently opened by plaintiff and Cheema, also asserts that plaintiff "was very grateful that [his] brother [Cheema] helped him out." (Declaration of Umar Cheema in Support of Cross

---

[1] To the extent plaintiff's assertions in his declaration in opposition to defendants' cross motion merely reiterate the assertions in his declaration in support of his motion for injunctive relief, they are not repeated or cited herein. Only those non-conclusory assertions in plaintiff's declaration in opposition to defendants' cross motion that are based upon his personal knowledge and offer new evidence material to the outcome of the parties' motions are set forth herein.

Motion and in Opposition to Motion for a TRO ["Umar Decl."], ¶ 4). However, according to plaintiff, "one of the reasons . . . [Cheema] approached [him] was" because his Teaneck restaurant "had established a solid reputation and attracted the attention of many consumers of halal food[] because . . . [it] was among the first restaurants serving exclusively halal meat in the Tri-State area." (Plf. Decl., ¶ 6).

In December 2017, plaintiff entered into a partnership with Cheema to open and operate a restaurant located at 799 Elmont Road, Elmont, New York, 11003 (the "Elmont restaurant"), which they named "Addy's BBQ."[2] (Plf. Decl., ¶¶ 4, 7; Cheema Decl., ¶¶ 4, 6). Although the parties dispute whether their partnership agreement was ever memorialized in writing, (*compare* Plf. Decl., ¶ 8 [claiming that there was never a written partnership agreement] *with* Cheema Decl., ¶ 6 [claiming that there was a written partnership agreement, but that he does not have a copy of it]), neither party has produced a copy of any written partnership agreement between them.

According to Cheema, under the terms of the partnership agreement, *inter alia*, (a) he owned seventy percent (70%) of the Elmont Restaurant and plaintiff owned thirty percent (30%); (b) "[s]ince plaintiff had no capital to invest he brought his Teaneck restaurant into the partnership with the same split;" (c) Cheema "would have first right of refusal in the next five (5) businesses that plaintiff would start, if any;" (d) plaintiff would receive a monthly payment of six thousand dollars ($6,000.00), but Cheema "took nothing and reinvested everything back into the business;" and (e) "if anything happened to plaintiff's family they would be taken care of from the businesses." (Cheema Decl., ¶ 6; *see also Id.*, ¶ 13 [claiming a seventy percent (70%) interest

---

[2] According to Cheema, he and plaintiff "purposely did not want to use the name Addy's Barbeque because plaintiff, upon information and belief, had tax liens filed against him and the Teaneck business." (Cheema Decl., ¶ 4; *See also Id.*, ¶ 8).

in both the Elmont and Teaneck restaurants]). Plaintiff disputes that Cheema was ever given an ownership interest in the Teaneck restaurant, (Plf. Decl., ¶ 5), but does not indicate what any of the specific terms of the alleged partnership agreement were.[3]

The Elmont restaurant opened in January 2018. (Plf. Decl., ¶ 7). According to Cheema, his "responsibilities included floor management, focusing on business growth, accounting and marketing[,]" whereas plaintiff "was to create the menu and be in charge of the kitchen." (Cheema Decl., ¶ 7). Cheema further asserts, *inter alia*, that he "kept investing in the renovation, marketing, store front and the purchase of equipment[;]" and he "also formed the company Qabila Afghan Grill, LLC ['QAG'] DBA Addy's BBQ," but plaintiff's "name was not on the company papers or the lease. . . ."[4] (*Id.*, ¶ 8).

According to plaintiff, his "business relationship with Cheema was not profitable or harmonious from the very beginning[,]" (Plf. Decl., ¶ 10), and "[t]here were several issues between [him] and Cheema, as the way [Cheema] managed the [Elmont] restaurant did not satisfy [plaintiff's] criteria and . . . expectations." (*Id.*, ¶ 11). Plaintiff also asserts that he was not satisfied with "the supplier and the quality of the meats offered;" the competency, professionalism or "quality" of the personnel and waitstaff; or "the conditions in the kitchen" of the Elmont restaurant. (*Id.*, ¶¶ 12-13).

However, according to Cheema, "[d]espite plaintiff's claims to the contrary," the partnership "got off to a pretty good start and in [their] first month [they] did approximately $30,000 worth of business. In March and April, 2018 [they] did about $50,000 worth of business

---

[3] Indeed, plaintiff inconsistently contends that the relationship between the parties was that of a partnership, a licensor/licensee and a franchisor/franchisee, but offers no evidence in support thereof and does not identify the specific terms of any type of agreement between the parties.

[4] According to the New York State Department of State ("NYSDOS") website, the initial NYSDOS filing date for QAC was November 28, 2017. *See* https://appex20.dos.ny.gov/ (last visited 10/21/2019).

each month." (Cheema Decl., ¶ 9). Cheema further asserts that plaintiff and/or his wife "received monthly checks" from the Elmont restaurant, (*id.*), and he submits six (6) checks payable to plaintiff and/or his wife by QAC from March 2018 to July 2018, five (5) of which contain the notation "salary" on the memo line. (*Id.*, Ex. A). According to plaintiff, those checks "were given to [him] as a [sic] compensation for [his] work at the [Elmont] restaurant. Throughout the duration of the partnership, [he] was working long hours every day, all day into the night preparing meals and training employees." (Plaintiff's Declaration in Opposition to Defendants' Cross Motion ["Plf. Opp."], ¶ 13).

In July 2018, plaintiff "decided to depart the partnership." (Plf. Decl., ¶ 9; *see also* Cheema Decl., ¶ 11). According to plaintiff, upon his departure, he "left equipment and several objects at the Elmont restaurant" and made it clear to Cheema that he could "keep all of them, as long as, he stops using [plaintiff's] name ('Chef Addy' or 'Addy') and [plaintiff's] brand name (Addy's Barbeque)[,]" (Plf. Decl., ¶ 14), because he did not want the Teaneck restaurant to be associated with the Elmont restaurant.[5] (*Id.*). Plaintiff asserts that defendant neither returned the equipment that he left at the Elmont restaurant, nor stopped using plaintiff's purported "brand name despite [plaintiff] forbidding him from doing so." (Plf. Decl., ¶ 15; *see also Id.*, ¶ 16 [claiming that plaintiff "explicitly forbade [Cheema] from using [his] name or trademark"]). According to plaintiff, he "never allowed [Cheema] to use [his] name or received consideration in order to grant him a permission to conduct business under [plaintiff's] trademark and name." (*Id.*, ¶ 16; *see also* Plf. Opp., ¶ 12 [asserting, *inter alia*, that after plaintiff left the partnership, he "explicitly forbade [Cheema] from using [his] name or trademark"]).

---

[5] Plaintiff also asserts that he did not want another restaurant that he opened in Astoria, New York to be associated with the Elmont restaurant. (Plf. Decl., ¶ 14). However, it is undisputed that plaintiff did not open the Astoria restaurant until approximately four (4) months after his departure from the partnership with Cheema.

However, Cheema asserts that after plaintiff left the partnership, he consented to defendants continued use of the name "Addy's BBQ." (Cheema Decl., ¶ 13). In support of that assertion, defendants submit a screenshot of a partial text message sent by plaintiff on September 7, 2018 indicating, in relevant part, "You were right in saying nothing there is mine, as when I left I left it all to you. *As for the name*, recipes and menu *I did give you open heartedly without falter and that too is yours*. . . . This is the last you'll hear from me. I forgive you for any wrongdoing . . . and ask you do the same, and no, you're not a liar or a thief, but someone I still love and respect dearly. . . ."[6] (*Id.*, Ex. C) (emphasis added). In addition, Umar avers, *inter alia*, that "[o]n multiple occasions plaintiff personally told [him] that the name of the Elmont restaurant belonged to [Cheema]." (Umar Decl., ¶ 4).

In August or November 2018, plaintiff opened another restaurant named "Addy's Barbeque," located at 30-94 Steinway St., Astoria, New York 11103 (the "Astoria restaurant"). (Plf. Decl., ¶ 2; Cheema Decl., ¶ 12). Cheema never had any ownership interest in the Astoria restaurant. (Plf. Decl., ¶ 5). However, according to Cheema, the Astoria restaurant "was [his] idea and location while [they] were partners. . . ." (Cheema Decl., ¶ 12).

Subsequently, on February 21, 2019, *i.e.*, approximately seven (7) months after leaving the partnership, plaintiff filed an application with the United States Patent and Trademark Office ("USPTO") to register the service mark, "Addy's Barbeque," consisting of "standard characters, without claim to any particular font style, size, or color," but disclaiming the exclusive right to use the word "barbeque," on the Principal Register for International Class 43: "Restaurant services; Restaurant services, including sit-down service of food and take-out restaurant

---

[6] Cheema also submits an apparent post from plaintiff's Facebook page as evidence, *inter alia*, that "[t]here was no ill will or bad blood between [the parties]." (Cheema Decl., Ex. D). However, there is no URL indicating the source of that post on the exhibit.

services." (Plf. Decl., Ex. G). Plaintiff claimed first use of the service mark "[a]t least as early as" February 5, 2015, and first use in commerce of the mark "[a]t least as early as" March 22, 2015. (*Id.*). The mark was published in the Trademark Official Gazette on June 25, 2019, and no opposition thereto was filed during the thirty (30)-day opposition period, *i.e.*, by July 25, 2019. (*Id.*). The mark was registered on September 10, 2019. (Plf. Opp., Ex. A).

On or about February 27, 2019, plaintiff's attorneys sent Cheema a "Demand to Cease and Desist" letter (the "cease and desist letter"), *inter alia*, demanding that Cheema "immediately: (i) cease and desist [his] unauthorized use of Addy's BBQ's name as well as [plaintiff's] name; (ii) provide [them] with prompt written assurance that [he] will cease and desist from further use of Addy's BBQ's name and [plaintiff's] name; and (iii) immediately return all items brought by [plaintiff] to the Elmont location." (Plf. Decl., Ex. F). According to Cheema, plaintiff subsequently called and told him "to ignore the letter as it was only sent at the insistence of his attorneys." (Cheema Decl., ¶ 17).

Plaintiff contends, *inter alia*, that "Cheema, by using a confusingly similar variation to [his] trademark, intends to compete unlawfully and unfairly against [plaintiff's] business, and to steal [his] customers who are fans of [his] recipes." (Plf. Opp., ¶ 17). Cheema, on the other hand, asserts that plaintiff filed the application for a trademark "in a bad faith effort to harm [his] business and infringe on the success" of the Elmont restaurant, (Cheema Decl., ¶ 14); and that the "Addy's BBQ mark was in exclusive use prior to March, 2019 so plaintiff's infringement claim should fail." (*Id.*, ¶ 17).

Plaintiff asserts that many customers go to defendants' Elmont restaurant "because they mistakenly believe that . . . [it] is affiliated with" his Teaneck and Astoria restaurants." (Plf. Decl., ¶ 17). In support of that assertion, plaintiff submits various comments and reviews from

anonymous individuals on the "Yelp" website indicating that some consumers presumed that there is or was an association between the Elmont restaurant and the Teaneck and/or Astoria restaurants.[7] (*Id.*, Ex. A).

<hr/>

[7] While the anonymous internet reviews do not constitute hearsay, *see, e.g. Sarkis' Café, Inc. v. Sarks in the Park, LLC*, No. 12 C 9686, 2016 WL 723135, at * 8 n. 15 (N.D. Ill. Feb. 24, 2016); *You Fit, Inc. v. Pleasanton Fitness, LLC*, No. 8:12-cv-1917-T-27EAJ, 2013 WL 521784, at * 5 n. 13 (M.D. Fla. Feb. 11, 2013), the Court finds that those submitted by plaintiff are insufficient to establish a likelihood of confusion, particularly since, *inter alia*, of the ten (10) reviews that suggest any association between defendants' Elmont restaurant and the Teaneck and/or Astoria restaurants, all except four (4) are dated during the period when the partnership between plaintiff and Cheema existed and, thus, when there was an association between the restaurants, (Plf. Decl., Ex. A [*compare* reviews dated 4/15/2018, 2/3/2018, 4/26/18 (by Iconic 1. and Mishal S.), 5/19/2018, 6/30/2018 *with* reviews dated 1/25/2019, 5/1/2019 (from Ashaab A. and Fayek C.) and 5/5/2019]); and one (1) of the four (4) reviews dated after plaintiff left the partnership (hereinafter referred to as a "post-partnership review") specifically disclaims any continued association between the restaurants, *i.e.*, the review dated January 25, 2019 provides, in relevant part, "We asked the owner [of the Elmont restaurant] if they were the same chain – he said they used to be, but decided to go separate ways." (*Id.*). Likewise, the post-partnership review dated May 5, 2019 actually states, in pertinent part, "Scam. *Copyright infringement possibly.* Avoid. Go to Astoria or Teaneck as those locations are original[,]" (*id.*) (emphasis added), thus suggesting that the reviewer was also aware that the Elmont restaurant was not associated with the Teaneck and Astoria restaurants. Therefore, two (2) of the four (4) post-partnership reviews suggesting any affiliation between plaintiff's and defendants' restaurants actually indicate that consumers were able to recognize that there had been a change of ownership. *See, e.g. Rib City Franchising, LLC v. Bowen*, No. 2:15-cv-00636, 2015 WL 6695723, at * 5 (D. Utah Nov. 3, 2015). In addition, although the review dated March 17, 2018, *i.e.*, while the partnership still existed, indicates, in relevant part, "I'm so glad that we don't have to drive out to Queens or the city for a delicious, halal burger[,]" (Plf. Decl., Ex. A), the reference to Queens clearly does not refer to the Astoria restaurant, as it was not opened until eight (8) months thereafter. Rather, that review suggests that while there were other restaurants offering halal meat in New York City, including Queens, the Elmont restaurant filled a void in that local area, *i.e.*, western Nassau County, for such food.

Moreover, while the printout with the URL https://www.yelp.com/biz/addys-bbq-elmont-2?start=60, dated July 31, 2019, indicates that there were ten (10) pages printed, plaintiff only submitted pages seven (7) through nine (9) thereof, with no explanation for the omission of the first six (6) pages. Similarly: (a) the printout with the URL https://www.yelp.com/biz/addys-bbq-elmont-2, dated July 31, 2019, indicates that there were thirteen (13) pages printed, but plaintiff only submitted pages eight (8) and nine (9) thereof, with no explanation for the omission of the other eleven (11) pages; (b) the printout with the URL https://www.yelp.com/biz/addys-bbq-elmont-2?start=20, dated July 31, 2019, indicates that there were twelve (12) pages printed, but plaintiff only submitted pages four (4) and ten (10) thereof, with no explanation for the omission of the other ten (10) pages; (c) the printout with the URL https://www.yelp.com/biz/addys-bbq-elmont-2?start=80, dated July 31, 2019, indicates that there were eight (8) pages printed, but plaintiff only submitted page two (2) thereof, with no explanation for the omission of the other seven (7) pages; (d) the printout with the URL https://www.yelp.com/biz/addys-bbq-elmont-2?start=40, dated July 31, 2019, indicates that there were ten (10) pages printed, but plaintiff only submitted page eight (8) thereof, with no explanation for the omission of the other nine (9) pages; and (e) and the printout with the URL https://www.yelp.com/biz/addys-bbq-elmont-2?start=120, dated July 31, 2019, indicates that there were six (6) pages printed, but plaintiff only submitted page three (3) thereof, with no explanation for the omission of the other five (5) pages. The Court infers from plaintiff's omission of those pages that approximately forty-eight (48) of the fifty-nine (59) pages printed on July 31, 2019 contained reviews or comments that made no association between Cheema's Elmont restaurant and plaintiff's Teaneck and/or Astoria restaurants, either before or after the parties' partnership ended.

According to Cheema, "[i]n or about March, 2019 plaintiff called [him] to apologize on behalf of his brother and his friends who he directed to go on social media and post negative and borderline slanderous statements about [him] and the Elmont restaurant." (Cheema Decl., ¶ 17).

Plaintiff also asserts that on one (1) occasion, on or about July 26, 2019, he received invoices from his own meat supplier that purportedly "were intended to be sent to Defendants," which allegedly "shows the confusion in the mind of the meat supplier as to whether [plaintiff's] restaurants and the Elmont restaurant are affiliated or part of the same brand." (Plf. Decl., ¶ 18). In support thereof, plaintiff submits what appears to be screenshots from an unidentified cellular telephone with images of two (2) invoices, both dated July 26, 2019. (*Id.*, Ex. B). Under the phrase "BILL TO," (a) one (1) of the invoices indicates only "Addys BBQ," without an address or a person to whose attention it was directed; and (b) the other invoice indicates "Honest Butcher," located at 791 Elmont Road, Elmont, New York, (*id.*, Ex. B), which presumably is a business located near the Elmont restaurant. (Plf. Decl., ¶ 7).

Plaintiff also submits, as "some examples where Defendants advertised and promoted their restaurant using [plaintiff's] name and [his] successful business," (Plf. Decl., ¶ 19): (i) a printout with the URL https://www.facebook.com/pg/addybbqelmont/about/, dated April 15, 2019, indicating, *inter alia*, that the Elmont restaurant started on December 19, 2018 and that "Adnan Alam Khan (Chef Addy)," *i.e.*, plaintiff, was part of its culinary team; and (ii) two (2) pages of a fifteen (15)-page printout with the URL https://www.yelp.com/biz/addys-bbq-elmont-2, dated May 15, 2019, indicating, *inter alia*, under the heading, "About the Business," that the Elmont restaurant was "[e]stablished in 2018. After a huge success of Addys BBQ NJ. We humbly open doors to our location in Elmont, NY." (Plf. Decl., Ex. C).

In addition, plaintiff submits the delivery menu for his Teaneck restaurant, as listed on the Grubhub website, https://www.grubhub.com/restaurant/addys-bbq-1199-teaneck-rd-teaneck/881380, as of August 8, 2019, and the menu for defendants' Elmont restaurant, as listed on the Seamless website, https://www.seamless.com/menu/addys-bbq-799-elmont-rd-elmont/986851, as of August 8, 2019, as purported support for his assertion that the Elmont restaurant "offers many menu items which [he] created, designed, and named and which [he] had been offering at the Teaneck restaurant prior to the opening of the Elmont restaurant."[8] (Plf. Decl., ¶ 20 and Ex. D and E).

In or around August 2019, the Teaneck restaurant was closed. (*See* Cheema Decl., ¶¶ 5, 11 and Ex. B).

B.  Procedural History

On April 16, 2019, plaintiff commenced this action against defendants alleging, *inter alia*, trademark infringement, false designation of origin and unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and New York common law; trademark dilution in violation of the FTDA, 15 U.S.C. § 1125(c), and N.Y. Gen. Bus. Law § 360-*l*; and cybersquatting in violation of the ACPA, 15 U.S.C. § 1125(d).

---

[8] Plaintiff's assertions, *inter alia*, that he has been informed by an unidentified person or persons "that the similarity of the restaurants' menu items has contributed to the confusion among customers as to whether Defendants' restaurant is affiliated with [his]," (Plf. Decl., ¶ 21); and that "various customers believe" that the Elmont restaurant "offers substandard food," (*id.*, ¶ 29), constitute inadmissible hearsay. Moreover, plaintiff's conclusory and unsupported assertions, *e.g.* that he "lose[s] customers every day because many customers, especially those residing in Long Island, visit Defendants' restaurant for [his] recipes," (*id.*, ¶ 24; Plf. Opp., ¶ 15); that he suffered a "significant drop on [his] revenues," (Plf. Decl., ¶ 25; Plf. Opp., ¶ 16); that  he "managed to build and establish [his] good reputation as Chef Addy" as a result of the "high quality standards" he maintained at the Teaneck and Astoria restaurants, (Plf. Decl., ¶ 26); that his "business reputation and goodwill have been injured," (Plf. Opp., ¶ 18); etc., are entitled to little or no weight.

Plaintiff now moves pursuant to Rule 65 of the Federal Rules of Civil Procedure for a TRO and preliminary injunction enjoining and restraining defendants from using the mark "Addy's BBQ," and the domain name, http://addysbbq.com/; and defendants cross-move to cancel plaintiff's service mark, "Addy's Barbeque," pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119.

II.      DISCUSSION

      A.      Plaintiff's Motion for Injunctive Relief

            1.      Standard of Review

"A preliminary injunction is an equitable remedy and an act of discretion by the court." *American Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, . . . but to balance the equities as the litigation moves forward." *Trump v. International Refugee Assistance Project*— U.S. —, 137 S. Ct. 2080, 2087, 198 L. Ed. 2d 643 (2017) (quotations and citations omitted).

"A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or [] sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quotations, alterations and citation omitted); *see also North American Soccer League, LLC v. United States Soccer Fed'n, Inc. ("NASL")*, 883 F.3d 32, 37 (2d Cir. 2018) ("A party seeking a

preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.") "[A] preliminary injunction is 'an extraordinary remedy never awarded as of right[,]'" *Benisek v. Lamone*, --- U.S. ---, 138 S. Ct. 1942, 1943, 201 L. Ed. 2d 398 (2018) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)), and "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (emphasis in original)); *accord Capstone Logistics Holdings, Inc. v. Navarrete*, 736 F. App'x 25, 26 (2d Cir. Aug. 31, 2018)(summary order).

2.      Likelihood of Success on the Merits

a.      Trademark Infringement Claims[9]

Section 43(a)(1)(A) of the Lanham Act imposes liability upon "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-- (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . ." 15 U.S.C. § 1125(a)(1)(A).

---

[9] "The elements of a cause of action for New York common law infringement and for unfair competition mirror the requirements of claims stated under the Lanham Act[.]" *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 372 (S.D.N.Y. 2018) (quotations, alterations and citation omitted); *accord ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008).

"A claim of trademark infringement under the Lanham Act is analyzed under a two-prong test[,]" *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016), pursuant to which the court first considers "whether the senior user's mark is entitled to protection; . . . [then] to whether the junior user's use of its mark is likely to cause consumers confusion as to the origin or sponsorship of the junior user's goods." *Id.*; *see also Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 417 (C.A.2, 2018) ("The test for trademark infringement looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." (quotations, alterations and citation omitted)). Thus, "[t]he plaintiff in a trademark infringement action establishes a likelihood of success by showing both 1) a legal, exclusive right to the mark, and 2) a likelihood that customers will be confused as to the source of the infringing product." *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999).

i.        Legal, Exclusive Right to the Mark

"Whether a mark is entitled to protection depends, in part, upon a showing of prior use." *Excelled Sheepskin*, 897 F.3d at 417. "Common law trademark rights derive from 'initial appropriation and use [ ] accompanied by an intention to continue exploiting the mark commercially.'" *Id.* at 418 (brackets in original) (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974)). "To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory...." *Id.* (quoting *La Societe*, 495 F.2d at 1271-72).

Plaintiff correctly contends that "a certificate of registration with the [US]PTO is prima facie evidence that the mark is registered and valid (*i.e.*, protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Guthrie*, 826 F.3d at 37 (quotations and citation omitted); *accord Christian Louboutin, S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224-25 (2d Cir. 2012); *see also* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.") However, this "statutory presumption may be overcome," *Excelled Sheepskin*, 897 F.3d at 419, if the allegedly infringing party demonstrates by a preponderance of the evidence "that the mark is ineligible for protection." *Christian Louboutin*, 696 F.3d at 216 n. 10; *see also Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) ("[W]hen a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of mark's protectibility [sic] by a preponderance of the evidence.").

"As a general matter, registration creates no substantive trademark rights against infringement beyond the common law rights acquired through use of the mark." *Excelled Sheepskin*, 897 F.3d at 419 (quoting *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir. 1999)); *see also ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007) ("[T]rademark rights are acquired and maintained through use of a particular mark[,] . . . even of marks that have been registered with the [USPTO] . . . . Indeed, one of the fundamental premises underlying the registration provisions in the Lanham Act is that trademark rights flow from

priority and that priority is acquired through use."); *La Societe*, 495 F.2d at 1271 ("There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trademarks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not is [sic] mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.")

Since, as set forth below, plaintiff has not established a likelihood of confusion, a likelihood of irreparable harm absent injunctive relief or that the balance of equities weigh in favor of granting him injunctive relief, it is presumed, without deciding, for purposes of this motion only, that plaintiff has a legal, exclusive right to the mark.

ii.     Likelihood-of-Confusion

Plaintiff has not established a likelihood of success on the merits, much less a clear or substantial likelihood of success on the merits, on his claim that consumers will likely be confused as to the source, sponsorship or affiliation of the Elmont restaurant. "The likelihood-of-confusion prong turns on whether ordinary consumers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the junior user's mark." *Guthrie*, 826 F.3d at 37 (quotations, alterations and citation omitted). "[S]atisfaction of the likelihood-of-confusion standard requires a probability of confusion, not a mere possibility." *Id.* (quotations and citation omitted); *see also Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005) ("To prevail in a trademark infringement action under the Lanham Act, a plaintiff must prove, in addition to protectability of the mark, a

probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers." (quotations and citation omitted)); *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998) ("To support a finding of infringement, a probability of confusion, not a mere possibility, must exist.")

In considering the likelihood of confusion, courts "generally examine the non-exclusive list of eight factors suggested . . . in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961): the strength of the senior user's mark; the similarity of the parties' marks; the proximity of the parties' areas of commerce; the likelihood that the senior user will bridge the gap separating their areas of activity; the existence of actual consumer confusion; whether the junior user acted in bad faith or was otherwise reprehensible in adopting the mark; the quality of the junior user's product; and the sophistication of the relevant consumer group." *Guthrie*, 826 F.3d at 37. Three (3) additional factors "to be considered when they are pertinent to the facts[,] . . . [are] 'the rather sterile nature of plaintiffs' three-year priority due to their exceedingly limited sales in this country, their long delay in asserting their claim, and the serious harm an injunction would cause the defendant as against the trifling benefit to the plaintiffs.'" *Id.* at 37, n. 3 (quoting *Chandon Champagne Corp. v. San Marino Wine Corp*, 335 F.2d 531, 536 (2d Cir. 1964)). "The pertinence of individual factors varies with the facts of the particular case[,] [and] [c]ourts should not treat any one factor as dispositive[.]" *Id.* at 37; *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) ("The application of the *Polaroid* test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." (quotations and citation omitted)).

Only the second *Polaroid* factor, *i.e.*, the similarity of the marks, clearly weighs in favor of plaintiff. With respect to the first factor, *i.e.*, strength of the mark,

"[t]he term 'strength' refers primarily to four categories of gradually increasing protection accorded to trademarks[:] . . . At the bottom of the ladder is the generic mark, which is understood as referring to the genus of which the particular product is a species. . . . On the next rung up the ladder of strength is descriptive marks[,] . . . [which] command weak protection. The next rung up the ladder is for suggestive marks—those that communicate something about the product to which they relate, but by suggestion rather than description. These are accorded somewhat stronger protection. Finally, the strongest protection goes to marks that are arbitrary or fanciful—marks that have no logical relationship to the product or service for which they were used."

*Guthrie*, 826 F.3d at 41 (quotations, alterations, emphasis and citations omitted). Plaintiff's mark, consisting of a personal name and a generic word, with no particular style, is a descriptive mark, *see Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987) (holding that "a personal name[] is a descriptive mark"); *see also Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 131 (2d Cir. 2004); *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 217 (2d Cir. 2003), *abrogated in part on other grounds by 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 215-16 (2d Cir. 2019), "and as such is generally weak unless there is evidence of secondary meaning."[10] *Patsy's Brand*, 317 F.3d at 217; *see also Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 160 n. 3 (2d Cir. 2016) ("Courts may view evidence concerning the origin-indicating significance of a mark in the marketplace as relevant to and probative of the strength of a mark and hence useful in assessing the likelihood of confusion." (quotations and citation omitted)); *815 Tonawanda St. Corp. v. Fay's Drug Co., Inc.*, 842 F.2d 643, 648 (2d Cir. 1988) ("For the purpose of trademark analysis, personal names—both surnames and first names—are generally regarded as descriptive terms which require proof of secondary

---

[10] "[A]lthough a registered mark is presumptively distinctive," *Brown v. Quiniou*, 744 F. Supp. 463, 469 (S.D.N.Y.,1990); *see also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976) ("[T]he decision of the Patent Office to register a mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is suggestive or arbitrary or fanciful rather than merely descriptive"), "it does not inevitably follow that the mark is strong." *Brown*, 744 F. Supp. at 469; *see also Nikon, Inc. v. Ikon, Corp.*, No. 89-cv-6044, 1992 WL 114509, at * 2 (S.D.N.Y. May 1, 1992) ("[R]egistration of a mark does not necessarily mean that a mark is strong.")

meaning."); *Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 234 F.3d 1262, 2000 WL 1721126, at *3 (2d Cir. Nov. 16, 2000) (unpublished opinion) ("Personal names are descriptive terms and, therefore, inherently weak.")

"A mark or trade name has acquired secondary meaning if a purchaser will associate it with a certain producer, and will be likely to make that same association when an identical mark (or a confusingly similar mark), is used on another producer's product." *Yarmuth-Dion*, 835 F.2d at 993 (quotations and citation omitted). "The existence of secondary meaning is an inherently factual inquiry in which . . . [courts] examine[]: (1) the senior user's advertising expenditures, (2) consumer studies linking the name to the source, (3) sales success, (4) unsolicited media coverage of the product, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Yarmuth-Dion*, 835 F.2d at 993; *see also Fay's Drug*, 842 F.2d at 648 ("Proof of secondary meaning entails vigorous evidentiary requirements. . . . Some of the factors this court has examined in determining whether a mark had secondary meaning include advertising expenditures, consumer surveys, media coverage, attempts to copy the mark, and length and exclusivity of use." (quotations, alterations and citations omitted)).

Plaintiff's evidence with respect to secondary meaning consists largely of his own assertions regarding the "high quality standards [he] maintain[s] at [his] 'Addy's Barbeque' restaurants in Teaneck and Astoria" and his "good reputation as Chef Addy," (Khan Decl., ¶ 26), which allegedly is "directly associated with [his] goodwill and business success." (*Id.*). However, "[s]uch 'opinion' testimony by a proprietor is considered self-serving and of little probative value." *Fay's Drug*, 842 F.2d at 648. Plaintiff does not proffer, *inter alia*, any consumer studies or surveys; affidavits from any of his customers; amounts of his sales or advertising expenditures at the Teaneck and/or Astoria restaurants; or proof of any unsolicited media coverage of his

restaurants. Although plaintiff may have enjoyed exclusive use of the "Addy's Barbeque" mark in the tri-state area for almost three (3) years before he and defendants opened the Elmont restaurant, "in the absence of other persuasive evidence demonstrating that consumers associate ['Addy's Barbeque'] with the plaintiff . . . [he] failed to meet [his] burden of proving secondary meaning." *Fay's Drug*, 842 F.2d at 648. Accordingly, plaintiff's mark "commands weak protection," *Guthrie*, 826 F.3d at 41, and, thus, the first factor weighs in favor of defendants.

"The proximity factor can apply to both the subject matter of the commerce in which the two parties engage and the geographic areas in which they operate[,]" *Guthrie*, 826 F.3d at 39, and "[i]ts pertinence depends on the logical proposition that the public is less likely to draw an inference of relatedness from similar marks when the marks' users are in dissimilar areas of commerce, or, depending on circumstances, are involved in localized commerce in geographic areas widely distant from one another." *Id.* Although the parties engage in the same area of commerce, *i.e.*, the operation of a restaurant serving halal food, they operate in distinct geographic services areas sufficiently distant from one another such that consumers are unlikely to be confused by defendants continued use of the name "Addy's BBQ" in connection with its operation of the Elmont restaurant.[11]

Similarly, the buyer sophistication factor has little to no bearing on the likelihood of confusion under the circumstances of this case. *See generally Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996) ("The eighth *Polaroid* factor, 'sophistication of the buyers," has been called 'analogous' to the proximity factor."); *E.A. Sween Co., Inc. v. Big City*

---

[11] According to Google maps, https://www.google.com/maps/dir/ (last visited 10/22/2019), the Teaneck restaurant was approximately twenty-five (25) miles from the Elmont restaurant; and the Astoria restaurant is approximately eighteen (18) miles from the Elmont restaurant, and across almost the entire borough of Queens, *i.e.*, the Astoria restaurant is located in western Queens near the Robert F. Kennedy Bridge, f/k/a the Triborough Bridge, which connects Queens, Manhattan and the Bronx, whereas the Elmont restaurant is located in western Nassau County, near the eastern border of Queens. Plaintiff presents no persuasive evidence of any overlap in the geographic reach or customer base of his restaurants and the Elmont restaurant.

*Deli Express Corp.*, No. 14-cv-6031, 2016 WL 5874998, at * 5 (E.D.N.Y. Oct. 8, 2016) ("The proximity factor is . . . generally considered alongside the factor regarding sophistication of the buyers."); *27-24 Tavern Corp. v. Dutch Kills Centraal*, No. 14-cv-1625, 2015 WL 5772158, at * 14 (E.D.N.Y. Sept. 29, 2015) (considering the proximity and buyer sophistication factors "in tandem").

"The factor that focuses on the 'likelihood that the prior owner will bridge the gap,' . . . becomes pertinent primarily when the junior user makes a credible case that there is little or no likelihood of consumer confusion because the senior user operates in a different field of enterprise or a different geographic area." *Guthrie*, 826 F.3d at 45 (quoting *Polaroid*, 287 F.2d at 495). "In such circumstances, the senior user can undercut the force of the junior user's argument by showing a likelihood that it will expand geographically or into other areas of commerce so that the likelihood of confusion will increase." *Id.*; *see also Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) ("Bridging the gap refers to the senior user's interest in preserving avenues of expansion and entering into related fields." (quotations and citation omitted)); *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 963 (2d Cir. 1996) (holding that the "bridging the gap" factor "looks to either the likelihood that [the senior user] will enter [the junior user's] business or the average customer's perception of the likelihood that the [senior user] would enter the [junior user's] market.") Other than the conclusory and self-serving statements in plaintiff's declaration, nothing in the record suggests that he ever had any intention of expanding his business to create a chain of restaurants; or that the public believed he was likely to do so. *See, e.g. Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 295 (S.D.N.Y. 2012) ("A speculative intention is insufficient to demonstrate that bridging the gap is likely; a litigant should provide evidence of a concrete expansion plan.") "[T]he intent of the

[senior] user to expand or its activities in preparation to do so, *unless known by prospective purchasers*, does not affect the likelihood of confusion." *Lang v. Retirement Living Publ'n Co., Inc.*, 949 F.2d 576, 582 (2d Cir. 1991) (emphasis in original) (quotations and citation omitted). Indeed, in his memorandum of law in support of his motion for injunctive relief, plaintiff does not assert any intent to expand his restaurant business geographically.

Likewise, plaintiff has not established that "relative quality as between a senior user's and a junior user's [product or services]," *Guthrie*, 829 F.3d at 44, should play any role in the Court's determination of likelihood of confusion under the circumstances of this case. Plaintiff has not submitted any persuasive evidence indicating that defendants' products and services are inferior to those provided at either the Teaneck or Astoria restaurants; nor that plaintiff's reputation could be jeopardized by the quality of defendants' products and services at the Elmont restaurant. *See Sports Auth.*, 89 F.3d at 965 (holding that the "relative quality" factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." (quotations and citation omitted)). Indeed, both of plaintiffs' restaurants, like the Elmont restaurant, had positive and negative customer reviews; and the Elmont restaurant had a higher rating than both of plaintiff's restaurants on at least one (1) website. (*See*, Cheema Decl., Ex. E).

Moreover, as set forth above, there is no persuasive evidence of actual consumer confusion resulting from defendants continued use of the name "Addy's BBQ" in their operation of the Elmont restaurant; nor of any bad faith or reprehensible conduct on defendants' part in continuing to use that name in their operation of the Elmont restaurant. Indeed, defendants present evidence indicating that plaintiff led them to believe that there was no impediment to their continued use of the name "Addy's BBQ" in their operation of the Elmont restaurant after

he left the partnership, (*see* Cheema Decl., Ex. C; and Umar Decl., ¶ 4), at least until his attorneys sent them the cease and desist letter in February 2019 approximately seven (7) months thereafter. Accordingly, plaintiff has not demonstrated a likelihood of confusion and, thus, has not established a likelihood of success on the merits, much less a clear or substantial likelihood of success on the merits, of his trademark infringement claims against defendants.[13]

b.      Cybersquatting Claim

The ACPA provides, in relevant part, that "[a] person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and (ii) registers, traffics in, or uses a domain name that-- (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or] (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark. . . ." 15 U.S.C. § 1125(d)(1)(A).

The ACPA was enacted "to protect consumers and holders of distinctive trademarks from 'cybersquatting,' which 'involves the registration as domain names of well-known trademarks by

---

[13] Since plaintiff has not demonstrated a likelihood of confusion, nor any bad faith on the part of defendants, he also failed to demonstrate a likelihood of success on the merits of his unfair competition claims under the New York common law. *See generally Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995) ("The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods. . . . In a common law unfair competition claim under New York law, the plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief. . . . Additionally, there must be some showing of bad faith." (quotations, alterations and citations omitted)); *see also Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 50-51 (2d Cir. 2019) ("The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another with some element of bad faith.")

non-trademark holders who then try to sell the names back to the trademark owners." *Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. Oct. 26, 2011) (summary order) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000)). "To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark." *Webadviso*, 448 F. App'x at 97. For purposes of this motion, only the "bad faith intent to profit" element is at issue.

"A 'bad faith intent to profit' is a term of art in the [ACPA] and cannot be equated with 'bad faith' in other contexts (such as trademark infringement)." *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 382 (S.D.N.Y. 2015) (citing *Sporty's Farm*, 202 F.3d at 499 n. 13); *accord NYP Holdings v. New York Post Publ'g, Inc.*, 63 F. Supp. 3d 328, 339 (S.D.N.Y. 2014). "A plaintiff must show that the defendant's use of the domain name is an attempt to profit specifically from 'squatting' on the domain name with bad faith, rather than simply [] another aspect of the alleged trademark infringement." *Flat Rate Movers*, 104 F. Supp. 3d at 382 (quotations, alterations and citation omitted); *see also Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 437 (S.D.N.Y. 2013) ("The requirement of bad faith intent to profit imposes an important limit that cabins the statute's scope and ensures that the ACPA targets only the specific evils that Congress sought to prevent.")

"With respect to the 'bad faith' element, the ACPA lists nine [9] non-exclusive factors for courts to consider in determining whether a domain name registrant has acted in bad faith[,]" *Webadviso*, 448 F. App'x at 97 (citing 15 U.S.C. § 1125(d)(1)(B)(i)); *see also Sporty's Farm*, 202 F.3d at 498, and "also sets forth a 'bad-faith safe harbor' provision[,]" *Webadviso*, 448 F.

App'x at 97, n. 2, which provides that "[b]ad faith intent described under subparagraph (A) [of 15 U.S.C. § 1125(d)(1)(a)] shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use *or otherwise lawful.*" 15 U.S.C. § 1125(d)(1)(B)(ii) (emphasis added). "[A] court must analyze each case based on its unique circumstances to determine how close a defendant's conduct falls to the ACPA's heartland[,]" *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 325 (S.D.N.Y. 2015), examples of which include situations "where a defendant registers an established entity's domain name in bad faith and offers to sell it to the entity for an exorbitant price[,] . . . [or] where a defendant intends to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those customers would purchase the defendant's products or services." *Id.* (quotations and citations omitted); *see also Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 351 (S.D.N.Y. 2014) (dismissing the plaintiff's cybersquatting claim where the allegations in the complaint did not "suggest that defendants perpetrated the core activities that threaten to result in the paradigmatic harm that the ACPA was enacted to eradicate, that is, the proliferation of cybersquatting– the Internet version of a land grab." (quotations and citation omitted)); *Gioconda*, 941 F. Supp. 2d at 437 ("The ACPA is designed principally for cases where a defendant either forces a markholder to purchase a domain name at an extortionate price or diverts customers from the markholder's website to the defendant's own website.")

Plaintiff has not established a likelihood of success on his claim that defendants ever had any bad faith intent to profit from any goodwill associated with plaintiff's mark by registering and using the domain name at issue. Indeed, plaintiff asserts only that defendants "have acted in bad faith to compete unlawfully and unfairly against [him], infringing his mark and trading on

his goodwill and business reputation[,]" (Plf. Mem. at 12); he does not assert that defendants had a bad faith intent to profit within the meaning of the ACPA. Moreover, given that the Elmont restaurant has been doing business as "Addy's BBQ" since it opened in January 2018; and the evidence demonstrating that plaintiff initially consented to defendants' use of the name "Addy's BBQ," both before and after he left the partnership, and did not object to defendants' continued use of the name for a period of approximately seven (7) months after he left the partnership, defendants had at least reasonable grounds to believe that the registration and use of the domain name at issue was lawful. Accordingly, plaintiff has not established a likelihood of success on the merits, much less a clear or substantial likelihood of success on the merits, of his cybersquatting claim under the ACPA.

c.    Trademark Dilution Claim under N.Y. Gen. Bus. Law § 360-*l*[12]

"New York law provides that a '[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief ... notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.'" *Starbucks*, 588 F.3d at 113-14 (alterations in original) (quoting N.Y. Gen. Bus. Law § 360–*l*); *accord E.A. Sween Co., Inc. v. A&M Deli Express Inc.*, --- F. App'x ---, 2019 WL 4744696, at * 4 (2d Cir. Sept. 30, 2019) (summary order). "Dilution is grounded on the idea that a trademark can lose its ability [] to clearly and unmistakably distinguish one source through unauthorized use. . . . It is a gradual whittling away of a firm's

---

[12] Plaintiff does not seek a TRO or preliminary injunctive relief based upon the likelihood of success on his trademark dilution claim under the FTDA.

distinctive trade-mark or name."[13] *Hormel*, 73 F.3d at 506 (quotations, alterations and citations omitted). "In order to establish a dilution claim, two elements must be shown: (1) ownership of a distinctive mark, and (2) a likelihood of dilution." *Hormel*, 73 F.3d at 506; *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006) (distinguishing the federal dilution standard, which "requires a showing of actual dilution" from the New York standard, which only "requires a showing of a mere likelihood of dilution." (quotations and citations omitted)).

Section 360-*l* of the New York General Business Law "provides for protection against both dilution by blurring and tarnishment[,] . . . [and] does not require a mark to be 'famous' for protection against dilution to apply." *Starbucks*, 568 F.3d at 114; *see also NYSE*, 293 F.3d at 557 ("Dilution under New York law can involve either blurring or tarnishment.") However, "New York law does not permit a dilution claim unless the marks are 'substantially' similar." *Starbucks*, 588 F.3d at 114; *see also A&M Deli*, --- F. App'x ---, 2019 WL 4744696, at * 4 ("In contrast to a dilution claim under the Lanham Act, a state law dilution claim does not require that a mark be famous to be protected, but does require that the marks be substantially similar." (quotations and citation omitted)). Plaintiff asserts both a dilution by blurring and a dilution by tarnishment claim.

"Blurring occurs 'where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.'" *NYSE*, 293 F.3d at 558 (quoting *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)). "To determine the likelihood of blurring, [the Second Circuit] . . . look[s] to six factors, including: (i) the similarity of the

---

[13] *Hormel* involved N.Y. Gen. Bus. Law § 368-d, the predecessor to N.Y. Gen. Bus. Law § 360-*l*. *See New York Stock Exch., Inc. v. New York, N.Y. Hotel LLC ("NYSE")*, 293 F.3d 550, 557 (2d Cir. 2002).

marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *NYSE*, 293 F.3d at 558; *accord A&M Deli*, --- F. App'x ---, 2019 WL 4744696, at * 4; *see also Lapine v. Seinfeld*, 375 F. App'x 81, 85 (2d Cir. Apr. 28, 2010) (summary order) ("To determine the likelihood of dilution by blurring, courts consider six factors similar to the *Polaroid* factors, . . . and assess the similarity of the marks in a similar fashion as under federal trademark law[.]" (quotations and citations omitted)). Although the first two (2) factors weigh in favor of plaintiff, the remaining four (4) do not. Due to, *inter alia*, the distinct geographic service areas of plaintiff's restaurants and defendants' Elmont restaurant, as set forth above, the elements of the sophistication of consumers and the renown of plaintiff's and defendants' marks weigh in favor of defendants, *i.e.*, there is little possibility plaintiff's mark "will lose its ability to serve as a unique identifier" of plaintiff's restaurant services, *Deere*, 41 F.3d at 43, by defendants' use of a similar mark in the operation of the Elmont restaurant; and the record is bereft of any persuasive evidence of predatory intent on the part of defendants. Accordingly, plaintiff has not established a likelihood of success, much less a clear or substantial likelihood of success, on the merits of his state law dilution by blurring claim.

"Tarnishment occurs where a trademark is 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *NYSE*, 293 F.3d at 558 (quoting *Deere*, 41 F.3d at 43); *accord Hormel*, 73 F.3d at 507. "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel*, 73 F.3d at 507. Since, *inter alia*, plaintiff has not demonstrated the inferior quality or "lack of prestige" in defendants' products or services, he has

not established a likelihood of success, much less a clear or substantial likelihood of success, on the merits of his state law dilution by tarnishment claim.

### 3.     Irreparable Injury

"Irreparable harm is defined as certain and imminent harm for which a monetary award does not adequately compensate[,] . . . [and] exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 F. App'x 716, 718 (2d Cir. Jan. 27, 2017) (summary order) (quotations and citations omitted); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (holding that irreparable harm is "harm to the plaintiff's legal interests that could not be remedied after a final adjudication.") "Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX*, 691 F.3d at 285. Thus, unless the movant demonstrates "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages[,] . . . a motion for a preliminary injunction should be denied." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (quotations and citations omitted); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) (holding that before a court may grant injunctive relief, the plaintiff must demonstrate, *inter alia*, "that remedies available at law, such as monetary damages, are inadequate to compensate for [its] injury."); *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ("[T]o satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be

remedied if a court waits until the end of trial to resolve the harm. . . . Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." (quotations, alterations and citations omitted)).

Following the Supreme Court's decision in *eBay*, the Second Circuit has held that in considering whether the plaintiff sufficiently demonstrated a likelihood of irreparable harm, "the court must not adopt a 'categorical' or 'general' rule *or presume that the plaintiff will suffer irreparable harm* (unless such a 'departure from the long tradition of equity practice' was intended by Congress)."[14] *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (emphasis added) (quoting *eBay*, 547 U.S. at 391, 393-94, 126 S. Ct. 1837). "Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'" *Id.* (quoting *eBay*, 547 U.S. at 391, 126 S. Ct. 1837); *accord WPIX*, 691 F.3d at 285. In other words, "[a]fter *eBay*, . . . courts must not simply presume irreparable harm. . . . Rather, plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause [a likelihood of] irreparable harm." *Salinger*, 607 F.3d at 82; *see also Silberstein v. Aetna, Inc.*, No. 13-cv-8759, 2014 WL 1388790, at *3 (S.D.N.Y. Apr. 9, 2014) ("[U]nder *eBay* and *Salinger*, Plaintiff cannot rely on a presumption of irreparable harm flowing from the violations that he alleges-he must make a separate showing of irreparable harm. Pre-*eBay* cases suggesting the contrary are not good law."); *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 660

---

[14] Although *Salinger* involved a Lanham Act copyright case, the Second Circuit found that "*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context." *Salinger*, 607 F.3d at 78. The Court also indicated that although it was "not called upon to extend *eBay* beyond the context of copyright cases, [it saw] no reason that *eBay* would not apply with equal force to an injunction in *any* type of case." *Salinger*, 607 F.3d at 78, n. 7 (emphasis in original).

(S.D.N.Y. 2013) ("To apply a different test [than *eBay*] or presumption of entitlement to an injunction would be a major departure from the long tradition of equity practice that should not be lightly implied. . . . [The Lanham Act's] grant of authority to issue injunctive relief contains no indication that any other standard should be employed and, to the contrary, expressly incorporates 'the principles of equity.' 15 U.S.C. § 1116(a)." (quotations, alterations and citations omitted)).

Plaintiff has not demonstrated that he would likely suffer irreparable harm in the absence of a preliminary injunction. The specific harm alleged by plaintiff from defendants continued use of the mark "Addy's BBQ" in their operation of the Elmont restaurant is: (i) the harm to his business reputation and goodwill from the loss of control over his trademark, which he alleges "continually threaten[s]" the viability of his restaurant business, (Plaintiff's Memorandum of Law in Support of Motion for TRO ["Plf. Mem."] at 16-19); and (ii) the harm "to his intellectual property rights and his ownership over the 'Addy's Barbeque' mark and brand." (*Id.* at 18).

However, plaintiff's conclusory and unsupported assertions, *inter alia*, of harm to his goodwill and reputation; the quality of defendants' products and services at the Elmont restaurant vis-à-vis those offered at plaintiff's restaurant[15]; the threat to the viability of his business; and the impossibility of calculating the number of customers he "will lose," (Plf. Mem. at 18), without more, are insufficient to satisfy his burden of showing that irreparable harm would be likely in the absence of a preliminary injunction. *See, e.g. Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 486 (W.D.N.Y. 2018) ("In failing to supply evidence of the loss of reputation or good will beyond his own conclusory averments, Plaintiff has not made a sufficient showing that irreparable harm is likely. . . ."); *CSI Entm't, Inc. v. Anthem Media Grp., Inc.*, No.

---

[15] Since the Teaneck restaurant is now closed, the Court construes plaintiff's allegations of harm to his restaurants and business as referring only to the Astoria restaurant.

15-cv-3508, 2016 WL 11263667, at * 7-8 (E.D.N.Y. Dec. 30, 2016), *report and recommendation adopted*, 2017 WL 2778466 (E.D.N.Y. June 27, 2017) (finding that the plaintiff's conclusory statements of loss of reputation were insufficient to show irreparable harm); *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, No. 10-cv-3314, 2015 WL 4033019, at * 11 (S.D.N.Y. June 29, 2015) ("[C]onclusory statements of loss of reputation will not justify an irreparable harm finding."); *Worldwide Diamond Trademarks, Ltd. v. Blue Nile, Inc.*, No. 14-cv-3521, 2014 WL 7933941, at * 4-5 (S.D.N.Y. Nov. 6, 2014) ("In general, injury resulting from the loss of goodwill is irreparable only when the very viability of the plaintiff's business, or substantial losses of sales beyond those of the terminated product, have been threatened." (quotations and citations omitted)). "[I]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 129 S. Ct. 365. Since, *inter alia*, plaintiff has not demonstrated a likelihood of confusion in consumers' minds resulting from defendants continued use of the name "Addy's BBQ" in connection with their operation of the Elmont restaurant, plaintiff has not established a likelihood of success on the merits of his claim that he would lose control over the reputation and goodwill of his mark.

Moreover, although defendants have continued to use the name "Addy's BBQ" in connection with the operation of the Elmont restaurant after plaintiff left the partnership in July 2018, plaintiff did not commence this action until April 16, 2019, *i.e.*, approximately nine (9) months later; and he did not seek injunctive relief until almost four (4) months thereafter, *i.e.*, on August 12, 2019, further suggesting a lack of irreparable harm. *See Levola v. Fischer*, 403 F. App'x 564, 565 (2d Cir. Dec. 14, 2010) (summary order) (affirming the district court's finding

that the plaintiff failed to demonstrate "that he faced an immediate danger of irreparable harm," in light of his delay in seeking injunctive relief); *CSI Entm't*, 2016 WL 11263667, at * 5 ("Because an application for a preliminary injunction now requires a movant to make an actual showing of imminent irreparable injury in the absence of an injunction, delay is an important factor that the Court must consider."); *e.g. Hornig v. Trustees of Columbia Univ. in City of New York*, No. 17-cv-3602, 2018 WL 5800801, at * 7 (S.D.N.Y. Nov. 5, 2018) (holding that the plaintiff's two and a half (2 ½) month delay in seeking injunctive relief undermined a finding of irreparable injury); *Livery Round Table, Inc. v. New York City FHV & Limousine Comm'n*, No. 18-cv-2349, 2018 WL 1890520, at * 9 (S.D.N.Y. Apr. 18, 2018) ("A delay of about three months undercuts a showing of immediate and irreparable injury.") Accordingly, plaintiff has not demonstrated a likelihood of imminent irreparable injury absent a preliminary injunction.

4.      Balance of Equities

Moreover, "the mere fact of seniority alone does not entitle the first user of a trademark to injunctive relief. The determination is to be made on the basis of the equities involved, and thereby requires an evaluation of the legitimate interests of the senior user, the junior user, and the consuming public." *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 664 (2d Cir. 1979); *see, e.g. Patsy's Italian Rest., Inc. v. Banas*, 658 F. 3d 254, 275-76 (2d Cir. 2011). Since "a party requesting a preliminary injunction must generally show reasonable diligence," *Benisek*, --- U.S. ---, 138 S. Ct. at 1944, in considering the balance of equities, an unreasonable delay in seeking injunctive relief may weigh against the party seeking such relief. *See Id.*

Furthermore, the Second Circuit has "long held in the context of trademark actions that where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer [], or acquiesces in the latter's use, [] a court of equity has the discretionary power [] to deny injunctive relief. . . ."[16] *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002). In *ProFitness*, the Second Circuit addressed the equitable doctrines of acquiescence and laches as follows:

> "The closely related doctrines of acquiescence and laches turn on 'a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.' *Carl Zeiss* [*Stiftung v. VEB Carl Zeiss Jena*], 433 F.2d [686,] 703 [2d Cir. 1970] (internal quotation marks omitted). Findings of delay and prejudice are central to both of these defenses. The elements of acquiescence are: '(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice.' *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002) (internal quotation marks omitted). Similarly, to 'prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action.' *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996).
>
> Although 'both [acquiescence and laches] connote consent by the owner to an infringing use of his mark, acquiescence implies active consent, while laches implies a merely passive consent.' *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 460, 462 (4th Cir. 1996); *see also Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 n. 2 (6th Cir. 2000). Active consent is implied by 'conduct on the plaintiff's part that amount[s] to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant.' *Carl Zeiss*, 433 F.2d at 704 (internal quotation marks omitted). In the case of laches, 'courts construe the plaintiff's unreasonable delay to imply consent to the defendant's conduct." *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 152 (5th Cir.1985)."

---

[16] Defendants assert, *inter alia*, the doctrine of acquiescence both as an affirmative defense in their answer to the complaint, (*see* Answer, ¶ 35), and in their opposition to plaintiff's motion for summary judgment. (*See* Def. Mem. at 7-8).

*ProFitness*, 314 F.3d at 67-68 (fourth brackets in original). "[A] plaintiff communicates active consent by conduct that amounts to an explicit or implicit assurance that plaintiff, with knowledge of defendant's conduct, will not assert its trademark rights." *ProFitness*, 314 F.3d at 68; *accord Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 29 (2d Cir. Jan. 4, 2013) (summary order).

The injunctive relief sought would provide little benefit to plaintiff, who, as set forth above, has not demonstrated any tangible harm, whether financial or reputational, from defendants continued use of a similar name in their operation of the Elmont restaurant; whereas defendants would be substantially harmed by enjoining them from continuing to operate the same business under the same name which they have operated for approximately two (2) years. Moreover, since, *inter alia*, plaintiff has not demonstrated a likelihood of confusion, and defendants presented evidence from which it may reasonably be inferred that plaintiff actively consented to defendants' continued use of the name "Addy's BBQ" in the operation of their Elmont restaurant for approximately seven (7) months before asserting any right of claim to the mark, without adequate explanation for such delay, the balance of equities weighs against granting plaintiff preliminary injunctive relief. *See, e.g. Total Control Apparel, Inc. v. DMD Int'l Imports, LLC*, 409 F. Supp. 2d 403, 409-10 (S.D.N.Y. 2006); *Mikhlyn v. Bove*, No. 08-cv-3367, 2008 WL 4610304, at * 15 (E.D.N.Y. Oct. 15, 2008).

Since, *inter alia*, plaintiff has neither demonstrated a likelihood of success on the merits of his claims nor imminent irreparable injury, and granting a preliminary injunction would effectively afford plaintiff the relief he desires at substantial harm to defendants, the balance of equities weighs against granting plaintiff injunctive relief at this juncture.[17] Accordingly,

---

[17] In light of this determination, it is unnecessary to consider the public interest element for a preliminary injunction. *Cf. Winter, 555 U.S. at 23-24, 129 S. Ct. 365* (declining to address the likelihood of success element for a

plaintiff's motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for a TRO and preliminary injunction enjoining and restraining defendants from using the mark "Addy's BBQ" and the domain name "addysbbq.com" is denied in its entirety.

B. Defendants' Cross Motion to Cancel the Registration of Plaintiff's Mark[18]

1. Standard of Review

a. Leave to Amend

"Leave to amend should be 'freely give[n] ... when justice so requires,' Fed. R. Civ. P. 15(a)(2), but 'should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party[.]'" *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (alterations in original) (quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)). "A proposed amendment to a [pleading] is futile when it could not withstand a motion to dismiss." *F5 Capital v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 473, 199 L. Ed. 2d 358 (2017) (quotations and citation omitted); *see, e.g. Force v. Facebook, Inc.*, 934 F.3d 53, 62 (2d Cir. 2019) ("Because the district court determined that it was futile to allow plaintiffs to file a second amended complaint, we evaluate that

---

preliminary injunction where consideration of the public interest element required denial of the requested injunctive relief). In any event, since, *inter alia*, plaintiff has not established a likelihood of consumer confusion, injunctive relief is not warranted in order to protect the public from "being misled." *Conopco*, 95 F.3d at 193 ("[T]he trademark laws protect [] the public's interest in not being misled." (quotations, alterations and citation omitted)).

[18] In their answer to the complaint, defendants assert only one (1) counterclaim against plaintiff for breach of contract. Since defendants did not assert a counterclaim to cancel plaintiff's registration in their answer to the complaint, the Court construes their cross motion as seeking both leave to amend their answer to assert counterclaims to cancel the registration pursuant to Rule 15 of the Federal Rules of Civil Procedure, *see generally Empresa Cubana del Tabaco v. Culbro Corp.*, 541 F.3d 476, 478-79 (2d Cir. 2008) (holding that a request for relief pursuant to 15 U.S.C. § 1119 "ordinarily is made as a counterclaim in an infringement action"); *Abercrombie*, 537 F.2d at 13 ("[Section] 37 of the Lanham Act permits cancellation on a counterclaim by a defendant who does not own a registered mark"), and summary judgment on such counterclaims pursuant to Rule 56 of the Federal Rules of Civil Procedure.

proposed complaint as we would a motion to dismiss, determining whether it contains enough facts to state a claim to relief that is plausible on its face." (quotations, alterations and citation omitted)).

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a party plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-- but it has not 'show[n]'-- 'that the pleader is entitled to relief.'" *Id.* at 679, 129 S. Ct. 1937 (brackets in original) (quoting Fed. R. Civ. P. 8(a)(2)). "Determining whether a [pleading] states a plausible claim for relief will[] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### b.  Summary Judgment

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to

a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); *see also Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations and citation omitted), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted); *see also Hancock v. County of Rensselaer*, 882 F.3d 58, 64 (2d Cir. 2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party.") "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *accord Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (quotations, alterations and citations omitted)).

Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (quotations and citations omitted).

### 2.    Proposed Claims to Cancel Plaintiff's Registration

Defendants seek to cancel the registration of plaintiff's mark pursuant to Section 37 of the Lanham Act, which provides:

> "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby."

15 U.S.C. § 1119. "[A] federal court may cancel the registration of a federally registered trademark if the challenger has standing and there is a valid ground for cancellation." *Brookfield Office Props. Inc. v. Hotel*, No. 16-cv-1854, 2016 WL 6906713, at *3 (S.D.N.Y. Nov. 18, 2016); *accord NameMedia*, 150 F. Supp. 3d at 333. The decision whether to grant relief under Section 37 of the Lanham Act "is committed to the discretion of the district court." *Empresa Cubana*, 541 F.3d at 478; *see also Abercrombie*, 537 F.2d at 13 ("Section 37 of the Lanham Act, 15 U.S.C.  § 1119, provides authority for the court to cancel those registrations of any party to an action involving a registered mark.")

Section 14 of the Lanham Act lists the grounds for cancellation of a trademark, *see* 15 U.S.C. § 1064, including, *inter alia*, that the trademark has "become[] the generic name for the goods or services, or a portion thereof, for which it is registered[;]" or that "its registration was obtained fraudulently." *Id.*, § 1064(3).

Defendants first seek cancellation of plaintiff's registration on the basis that the mark is merely generic. "A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie*, 537 F.2d at 9; *see also Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 214 n. 2 (2d Cir. 2003) ("Essentially, a mark is generic if, in the mind of the purchasing public it does not distinguish products on the basis of source but rather refers to the type of product.") "Generic marks, consisting of words that identify the type or species of goods or services to which they apply, are totally lacking in distinctive quality; they are not entitled to any protection against infringement, even if they have become famous as marks, because according such protection would deprive competitors of the right to refer to their goods by name." *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001).

Defendants' proposed counterclaim to cancel plaintiff's mark on the basis that it is generic is futile because, as set forth above, plaintiff's mark, as a whole, is not generic; it is at least descriptive. While the word "barbeque," standing alone, may be generic, and, therefore, not protectable; plaintiff's service mark consists of a combination of two (2) words, *i.e.*, the personal name "Addy's" together with the generic word, "barbeque;" and plaintiff's registration specifically disclaims the exclusive right to use the word "barbeque" apart from the mark as a whole. Since defendants do not allege, much less establish, that the mark, as a whole, is a generic term or common reference to goods or services, their proposed counterclaim to cancel plaintiff's mark on the basis that it is generic is futile. *See, e.g. Brookfield*, 2016 WL 6906713, at *3.

Defendants also seek to cancel plaintiff's mark on the grounds that they "had authority and consent to use the mark Addys [sic] BBQ and plaintiff filed and registered its mark in bad faith and as retaliation to Cheema—his former partner. . . ." (Def. Mem. at 3). The Court

construes this proposed claim as alleging that plaintiff defrauded the USPTO by declaring on his application to register the mark that "[t]o the best of [his] knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive[,]" (Khan Decl., Ex. F), while aware that defendants were using, and had a right to use, the mark, "Addy's BBQ." *See generally MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016) ("Under the Lanham Act, 'any person who believes that he is or will be damaged' may file a 'petition to cancel a registration of a mark,' for which 'registration was obtained fraudulently.'" (quoting 15 U.S.C. § 1064(3))).

"Fraud in procuring a trademark registration [] occurs when an applicant knowingly makes false, material representations of fact in connection with his application[,]" *MPC Franchise*, 826 F.3d at 658 (quotations, alterations and citation omitted)), "with the intent to deceive the [US]PTO." *Id.* at 659 (quotations and citation omitted); *see also Orient Express Trading Co., Ltd. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988) ("The allegedly fraudulent statements may not be the product of mere error or inadvertence, but must indicate a deliberate attempt to mislead the PTO. . . . [T]he knowing misstatement must have been with respect to a material fact—one that would have affected the PTO's action on the applications." (quotations, alterations and citations omitted)). Since "mere negligence is not sufficient to infer fraud on the PTO[,] . . . to succeed on a claim that a trademark holder procured the mark by fraud, a plaintiff cannot merely show that the trademark holder should have known that the application contained false statements of material fact." *MPC Franchise*, 826 F.3d at 659 (quotations, alterations and citations omitted). "A party seeking cancellation of a registered

trademark on grounds of fraud must demonstrate the alleged fraud by clear and convincing evidence." *MPC Franchise*, 826 F.3d at 658 (quotations and citation omitted); *accord Orient Express*, 842 F.2d at 653.

Based upon the record evidence, defendants' claim seeking to cancel registration of plaintiff's service mark on the grounds of fraud is plausible. *See, e.g. MPC Franchise*, 826 F.3d at 660-61 (affirming summary judgment on the plaintiff's claim seeking cancellation of the defendant's mark on the basis that "[n]o genuine issue of material fact exist[ed] as to whether [the defendant] knew that other entities had rights to use the mark in the very manner in which he sought to use the mark, and whether he intended to mislead the PTO by attesting otherwise in his trademark application."); *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1210 (11th Cir. 2008) ("Purposely failing to disclose other users' rights to use the same or similar marks may qualify as a material omission justifying cancellation of a trademark."); *East West, LLC v. Rahman*, 896 F. Supp. 2d 488, 508-09 (E.D. Va. 2012) (granting summary judgment cancelling the defendant's registration based upon clear and convincing evidence demonstrating that the defendant "knowingly made false, material misrepresentations as to exclusivity of use on their registration application with the [USPTO]."); *Automatic Washer Co. v. Easy Washing Mach. Corp.*, 98 F. Supp. 445, 452 (N.D.N.Y. 1951) (finding that the plaintiff's trademark was invalid, and its registration should be cancelled, because it did not have exclusive use of the mark prior to registration). Accordingly, defendants' cross motion is granted to the extent that they are granted leave to amend their answer to assert a counterclaim seeking to cancel plaintiff's registration of his service mark on the basis that the registration was obtained fraudulently, *provided* that defendants serve and file the amended answer **by no later than December 6, 2019**, or they will be deemed to have waived their right to file an amended answer asserting such

counterclaim. However, construing the evidence in the light most favorable to plaintiff, genuine issues of material fact exist with respect to that proposed counterclaim. Therefore, defendants' cross motion is otherwise denied.

III.     CONCLUSION

For the reasons set forth above, (i) plaintiff's motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for a TRO and preliminary injunction enjoining and restraining defendants from using the mark "Addy's BBQ" and the domain name "addysbbq.com" is denied in its entirety; (ii) defendants' cross motion is granted to the extent that defendants are granted leave to amend their answer to assert a counterclaim seeking to cancel the registration of plaintiff's mark pursuant Section 37 of the Lanham Act, 15 U.S.C. § 1119, on the basis that the registration was obtained fraudulently, *provided* that defendants serve and file the amended answer **by no later than December 6, 2019**, or they will be deemed to have waived their right to file an amended answer asserting such counterclaim; and (iii) defendants' cross motion is otherwise denied.

SO ORDERED.

_   /s/ *Sandra J. Feuerstein*   
Sandra J. Feuerstein
United States District Judge

Dated:  November 6, 2019
        Central Islip, New York